# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 33956

MICHAEL ANTHONY JONES, individually and as guardian ad item for RHYS ALEXANDER JONES (DOB 8/20/99) and MOIRA EIBHLIN JONES (DOB 7/04/02), LYNNE ROYER, as natural mother of LORI MARIE JONES, deceased, and KIM ROYER, as step-father of LORI MARIE JONES, deceased, husband and wife, and HAROLD BOWERS,

    Plaintiffs-Respondents,

v.

RICHARD E. CRAWFORTH, bankruptcy trustee for B&B AUTOTRANSFUSION SERVICES, INC., an Idaho corporation,

    Defendant-Appellant,

and

ANESTHESIOLOGY CONSULTANTS OF TREASURE VALLEY, PLLC, DEBORAH JENKINS, M.D., THOMAS LARK, M.D., HEALTHSOUTH TREASURE VALLEY HOSPITAL, and JOHN DOES I through V,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, December 2008

2009 Opinion No. 53

Filed: April 8, 2009

Stephen W. Kenyon, Clerk

SUBSTITUTE OPINION. THE COURT'S PRIOR OPINION DATED JANUARY 30, 2009, IS HEREBY WITHDRAWN.

---

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Ronald J. Wilper, District Judge.

District court decision on medical malpractice/wrongful death, affirmed.

Lynch & Associates, Boise, and Moffatt, Thomas, Barrett, Rock & Fields, Boise, for appellant. Gerald T. Husch argued.

Hepworth, Lezamiz & Janis, Chtd., Boise; Comstock & Bush, Boise; Mahoney Law, PLLC., Boise, for respondents. John J. Janis argued.

---

BURDICK, Justice

1

Appellant B&B Autotransfusion Services, Inc. (B&B) appeals the judgment entered in a medical malpractice/wrongful death case filed by Respondents Michael Anthony Jones, individually and as guardian ad litem for Rhys Alexander Jones and Moira Eibhlin Jones; Lynne Royer; Kim Royer; and Harold Bowers (Respondents) after the death of Lori Jones during surgery at HealthSouth Treasure Valley Hospital (TVH). The jury found that the defendants Dr. Deborah Jenkins, Dr. Thomas Lark, Anesthesiology Consultants of Treasure Valley (ACTV) (as employer of Drs. Jenkins and Lark), and B&B negligently caused the death of Ms. Jones. The jury apportioned 49% of the fault to B&B. A judgment of more than $2.9 million was entered against B&B, from which B&B appeals. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 2, 2004, Lori Jones underwent lumbar spine surgery at TVH and died when an air embolus entered her blood stream from the reinfusion bag. Two anesthesiologists were on hand for the surgery—Dr. Thomas Lark, the primary anesthesiologist, and Dr. Deborah Jenkins, the relief anesthesiologist. Drs. Lark and Jenkins were under contract with (ACTV), which provides all anesthesiology services at TVH. Jeri Kurtz, the certified cell saver technician employed by B&B, was also on hand for the surgery. B&B is a corporation, owned by Richard Borst, that contracts with various hospitals in the Treasure Valley to provide autotransfusion services during surgeries. As a cell saver technician, Kurtz was responsible for gathering the patient's blood during surgery and cleaning the blood in the cell saver machine before the cleaned blood was delivered from the machine back into the patient through the reinfusion bag.

Before Kurtz became a cell saver technician, she underwent training offered by Haemonetics Corporation, which manufactures the cell saver machines used by B&B. Kurtz testified that during this training the instructor pointed out the warning on the Haemonetics reinfusion bag, which states "Warning: Do not use with pressure cuff. Use of pressure cuff may lead to fatal infusion of air," and emphasized that this advice was always to be followed. Kurtz also testified she was informed that the machine delivered a significant amount of air to the reinfusion bag, and that air could be fatal. In addition, Kurtz acknowledged she was trained in what to do if she encountered a physician wanting to apply a pressure cuff or similar device to a reinfusion bag.

During Ms. Jones's surgery, Kurtz had processed the blood four times and had 500 milliliters of blood in the reinfusion bag to be returned to the patient at the time she transferred

the bag to Dr. Lark by placing the bag on an IV pole. Once Dr. Lark had the reinfusion blood running into the patient, Kurtz left the room to remove another machine. While Kurtz was out of the room, Dr. Jenkins relieved Dr. Lark so he could take a lunch break. After Dr. Lark left the room, Dr. Jenkins sought to speed up the reinfusion process. Dr. Jenkins found a pressure cuff and placed it on the bag; she later testified she had not noticed the warning on the bag that specifically cautioned against applying a pressure cuff. According to Dr. Jenkins, when Kurtz returned to the room she did not say anything to Dr. Jenkins about not using the pressure cuff; Kurtz claims she told Dr. Jenkins a pressure cuff should not be used on the reinfusion bag. It is undisputed that no conversation took place between Dr. Lark and Kurtz after Dr. Lark returned from his break.

When Kurtz noticed the blood had completely emptied from the reinfusion bag, she tapped Dr. Lark on the arm to inform him the bag was empty. He asked her how long the line had been empty, and she replied she did not know. Dr. Lark then realized there was air in the line going into the patient and they had a serious problem. Attempts at resuscitation were unsuccessful and Ms. Jones suffered a fatal air embolism.

Respondents brought suit, claiming Ms. Jones's wrongful death was caused by the combined medical fault of the two anesthesiologists and Kurtz. The jury returned a special verdict apportioning fault as follows: (1) Jeri Kurtz (B&B)—49%; (2) Dr. Jenkins—36%; and (3) Dr. Lark—15%. The jury also found the conduct of both Kurtz and Dr. Jenkins was "reckless." Total economic damages were awarded against B&B, Dr. Lark, and Dr. Jenkins in the amount of $2,012,083, and non-economic damages were awarded for $4,000,000. In accordance with the jury's apportionment of fault and award of damages, the district court entered a final judgment against B&B in the amount of $2,945,920.67. B&B appeals the final amended judgment entered on December 22, 2006.

## II. ANALYSIS

B&B raises a number of issues on appeal, including: (1) was Kurtz a "medical technologist" or other health care provider subject to I.C. § 6-1012; (2) should Respondents have been allowed to produce expert witnesses to offer opinions on whether Kurtz's conduct was "reckless"; (3) did the trial court err in refusing to put Haemonetics, TVH, and/or ACTV on the special verdict form; and (4) was it reversible error to exclude evidence of TVH's revised autotransfusion protocol. We affirm the district court's judgment on all issues.

**A.  Applicability of I.C. § 6-1012.**

B&B contends that Kurtz, as a cell saver technician, was not a "medical technologist" or other health care provider under I.C. § 6-1012, and therefore the district court erred in determining her liability based upon the community health care standard provided for in I.C. § 6-1012.  We disagree.

"The interpretation of a statute is a question of law over which we exercise free review.  When construing a statute, the words used must be given their plain, usual, and ordinary meaning, and the statute must be construed as a whole."  *Athay v. Stacey*, 142 Idaho 360, 365, 128 P.3d 897, 902 (2005) (citation omitted).  The plain language of I.C. § 6-1012 makes the statute applicable to actions

> brought against any physician and surgeon or *other provider of health care*, including, *without limitation*, any dentist, physicians' assistant, nurse practitioner, registered nurse, licensed practical nurse, nurse anesthetist, medical technologist, physical therapist, hospital or nursing home, or any person vicariously liable for the negligence of them or any of them, on account of the *provision of or failure to provide health care* or on  account of any matter  incidental or related thereto. . . .

(Emphasis added).  Respondents argue that the plain language of the statute indicates an intent to be extremely broad in scope through its application to any case brought against any "other provider of healthcare," and the inclusion of the words "without limitation" to the list of other providers.  We find this argument to be a valid interpretation of the plain meaning of I.C. § 6-1012.  Therefore, Kurtz, as a cell saver technician with an important role in the surgery of Ms. Jones, was a health care provider within the scope of I.C. § 6-1012.

In arguing that the district court erred in finding that Kurtz was a health care provider under I.C. § 6-1012, B&B focuses on the district court's statement that Kurtz "does fall within the definition of a medical technologist as contained in Idaho Code 6-1012."  While Kurtz may not be considered a medical technologist, this fact is irrelevant.  Taking the district court's statement in its full context, it is clear that the court intended to simply find that, as a matter of law, Kurtz was a health care provider covered by I.C. § 6-1012:

> As far as [counsel]'s motion in limine, the first one, having to do with the, essentially the contention that perhaps Ms. Kurtz is not covered under 6-1012, I find as a matter of law that she is.  I find that, to the extent that the question is clearly before the court as to whether or not the legislature—this particular statute intends to include people like Ms. Kurtz in her capacity as a Cell Saver technologist, I find that the statute is quite clear on the issue, and that she does fall within the definition of a medical technologist as contained in Idaho Code 6-1012.

4

Therefore, the district court was simply determining that Kurtz fell within the scope of I.C. § 6-1012, and that determination was not in error.

Furthermore, this Court in *Hough v. Fry*, 131 Idaho 230, 233, 953 P.2d 980, 983 (1998), stated that "by its plain and unambiguous language, [I.C. § 6-1012] applies when the damages complained of result from providing or failing to provide health care. Thus, to determine if I.C. § 6-1012 applies, courts need only look to see if the injury occurred *on account of the provision of or failure to provide health care*." (Emphasis added). While there was not a question in *Hough* as to whether someone was a health care provider within the meaning of the statute, the test provided in that case is useful in analyzing B&B's arguments. Ms. Jones's injury did occur on account of the provision of or failure to provide health care by Kurtz. Kurtz's role in the operating room was to gather, clean, and deliver the blood of the patient lost during the surgery into the reinfusion bag, and she was specifically trained as to the dangers of placing a pressure device on a reinfusion bag and of her responsibility to warn the doctor of the dangers.[1] Therefore, Kurtz was providing, or failing to provide, health care at the time of Ms. Jones's death.

B&B's argument also fails because B&B was not harmed by the district court's application of I.C. § 6-1012. Idaho Code § 6-1012 further provides that when an action against a health care provider is involved, the plaintiff must "affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence" that the defendant did not meet the applicable community health care standard. The provider of health care will then be "judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any." I.C. § 6-1012. The legislative purpose of I.C. § 6-1012 was to limit the liability exposure of health care providers by making a more strict requirement for "direct proof

---

[1] The following excerpt from Kurtz's testimony is indicative of her training:
> Q. In the presence of a pressure cuff being applied, would you agree that you were trained to inform the doctor of the warning?
> A. Yes.
> Q. Inform the doctor that there's a likelihood of air in the bag?
> A. Yes.
> Q. And that's what you were trained to do?
> A. Yes.

of departure from a community standard of practice."[2] 1976 Idaho Sess. Laws ch. 277, § 1, p. 951; *see also LePelley v. Grefenson*, 101 Idaho 422, 428, 614 P.2d 962, 968 (1980).

Therefore, I.C. § 6-1012 actually imposes a stricter burden of proof on the plaintiffs at trial by requiring them to produce expert testimony. Under I.C. § 6-1013, a plaintiff must offer evidence showing that the opinion is held by the expert witness, that the expert can testify with a reasonable degree of medical certainty as to that opinion, that the expert possesses professional knowledge and expertise, and that the expert has actual knowledge of the applicable community standard of care. I.C. § 6-1013; *Dulaney v. St. Alphonsus Reg'l Med. Ctr.*, 137 Idaho 160, 164, 45 P.3d 816, 820 (2002). Such requirements of proof are certainly more burdensome to Respondents in this case than to B&B. We, therefore, affirm the district court's decision to apply I.C. § 6-1012.

**B. Admissibility of expert testimony.**

B&B next argues that the district court erred in permitting Respondents to introduce the expert testimony of Dr. Jonathan Benumof and Eileen Heller that Kurtz's conduct was reckless. B&B contends that the testimony is inadmissible for two reasons: (1) there is no indication that either out-of-state expert knew the standard in Idaho for reckless misconduct under I.C. § 6-1603, and (2) neither expert is more qualified than the average juror to draw conclusions from the evidence regarding what Kurtz actually knew. We find the district court did not err in admitting the testimony of Dr. Benumof and Ms. Heller regarding Kurtz's conduct.

"The admissibility of expert testimony is a matter committed to the discretion of the trial court, and the court's ruling will not be overturned absent an abuse of that discretion." *Athay v. Stacey*, 142 Idaho 360, 366, 128 P.3d 897, 903 (2005). The sequence of inquiry to determine if there has been an abuse of discretion is: (1) whether the court correctly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently with the applicable legal standards; and (3) whether the court reached its decision by an exercise of reason. *Id.* "In the case of an incorrect ruling regarding evidence, a new trial is

---

[2] The purpose of I.C. § 6-1012 was included in Section 1 of the 1976 legislation:

It is the declaration of the legislature that appropriate measures are required in the public interest to assure that a liability insurance market be available to physicians, hospitals and other health care providers in this state and that the same be available at reasonable cost, thus assuring the availability of such health care providers for the provision of care to persons in the state. It is, therefore, further declared to be in the public interest that the liability exposure of such health care providers be limited and made more definable by a requirement for direct proof of departure from a community standard of practice.

merited only if the error affects a substantial right of one of the parties." *Morris v. Thomson*, 130 Idaho 138, 144, 937 P.2d 1212, 1218 (1997).

Furthermore, to be admissible the testimony must assist the trier of fact in understanding the evidence or determining an issue in fact. *Athay*, 142 Idaho at 366, 128 P.3d at 903. A trier of fact is not assisted by an opinion that is speculative or unsubstantiated by facts nor one that "concerns conclusions or opinions that the average juror would be qualified to draw from the facts utilizing the juror's common sense and normal experience." *Id*. at 366–67, 128 P.3d at 903–04. In *Athay*, the Court found that the district court had not abused its discretion in striking an expert's testimony that the conduct of officers constituted reckless disregard. The testimony was inadmissible for two reasons: (1) there was no indication that the expert knew the standard in Idaho for reckless disregard, and (2) the expert was no more qualified than the average juror to conclude from the evidence what any of the defendants had actually perceived or understood. *Id*. at 367, 128 P.3d at 904.

The district court did not abuse its discretion in allowing the testimony of Dr. Benumof and Ms. Heller in this case. The court perceived the issue as discretionary and its decision was within the outer boundaries of its discretion, consistent with legal standards, and reached by an exercise of reason. The district court did not allow the experts to present their opinions of the legal definition of reckless because it would "have a pretty high likelihood of misleading the jury and invading the province of the court to instruct the jury as to what the applicable law is." In fact, the court ordered the portions of Dr. Benumof's testimony regarding definitions of the word "reckless" redacted. Therefore, B&B's argument that the experts' testimony was inadmissible because they were not familiar with the legal standard for reckless misconduct in Idaho is without merit.

Instead, it was the opinions of the experts regarding the community standard of care that was the focus of the testimony. The district court allowed the two experts to testify as to what conduct they would characterize as reaching a level of negligence that they saw as reckless. This testimony was permissible because (1) the experts had acquainted themselves adequately with the community standard for health care providers such as Kurtz, and (2) their opinions as to the level of negligence of her conduct were not conclusions that the average juror would be qualified to draw. Idaho Code § 6-1012 requires expert testimony to prove that a health care provider is

---

1976 Idaho Sess. Laws ch. 277, § 1, p. 951.

negligent; therefore, the testimony of Dr. Benumof and Ms. Heller is precisely what the statute contemplates.

Furthermore, the experts were not offering their opinions as to whether Kurtz knew there was air in the bag. Kurtz had testified she knew from her training that a reinfusion bag would have a certain amount of air in it. In addition, when asked by counsel, "Would you agree with me that there was air in the bag?" she replied, "Yes." As such, the experts were merely utilizing Kurtz's own statements to reach their conclusions on the level of negligence of her conduct. Therefore, the district court acted within its discretion in allowing the testimony of Dr. Benumof and Ms. Heller.

## C. The exclusion of nonparties from the special verdict form.

B&B next argues that Haemonetics, TVH, and ACTV should have been included on the special verdict form, and the district court's refusal to do so constituted reversible error. Idaho recognizes that nonparties may be included on special verdict forms. Idaho Code § 6-802 states:

> The court may, and when requested by any party shall, direct the jury to find separate special verdicts determining the amount of damages and the percentage of negligence or comparative responsibility attributable to each party; and the court shall then reduce the amount of such damages in proportion to the amount of negligence or comparative responsibility attributable to the person recovering.

Idaho Code § 6-802 was first interpreted to include nonparties by this Court in *Pocatello Indus. Park Co. v. Steel West, Inc.*, 101 Idaho 783, 621 P.2d 399 (1980):

> It is established without doubt that, when apportioning negligence, a jury must have the opportunity to consider the negligence of all parties to the transaction, whether or not they be parties to the lawsuit and whether or not they can be liable to the plaintiff or to the other tortfeasors either by operation of law or because of a prior release. The reason for such (a rule) is that true apportionment cannot be achieved unless that apportionment includes all tortfeasors guilty of causal negligence either causing or contributing to the occurrence in question, whether or not they are parties to the case.

101 Idaho at 787, 621 P.2d at 403 (internal citations omitted). More recently, this Court reiterated that "true apportionment cannot be achieved unless [the jury verdict form] includes all tortfeasors guilty of causal negligence either causing or contributing to the occurrence in question, whether or not they are parties to the case." *Van Brunt v. Stoddard*, 136 Idaho 681, 687, 39 P.3d 621, 627 (2001).

Nevertheless, before a nonparty is included on a special verdict form, "there must be a showing that the requisite elements of a cause of action against them [ ] have been presented at trial." *Vannoy v. Uniroyal Tire Co.*, 111 Idaho 536, 551, 726 P.2d 648, 663 (1985) (Bistline, J.,

8

concurring). The Court in *Van Brunt* found that the district court had properly excluded a nonparty from the special verdict form because no causal connection between his actions and the injuries of the plaintiff were shown. 136 Idaho at 687–88, 39 P.2d at 627–28. In contrast, in *Le'Gall v. Lewis County*, 129 Idaho 182, 923 P.2d 427 (1996), this Court found that a nonparty actor should have been included on the special verdict form after evidence was presented that the actor had a duty, had breached that duty, and there was a causal connection between the breach and the injury. 129 Idaho at 185, 923 P.2d at 430. The Court found that, based upon that evidence, a jury could have concluded the actor had negligently contributed to the injury. *Id*. Therefore, to include a nonparty on a special verdict form the elements of the cause of action must have been presented at trial.

**1. TVH and ACTV were properly excluded from the special verdict form.**

The district court determined that TVH and ACTV should not be included on the special verdict form under Idaho law because B&B had failed to produce any expert testimony demonstrating that either of the entities' actions fell below the applicable standard of care. We agree.

> The elements of a cause of action for medical malpractice are stated in I.C. § 6-1012:
>
> In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care . . . such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided . . . .

Therefore, before any nonparties could be included on the special verdict form, B&B was required to present as part of its case in chief, by direct expert testimony, that the entities breached the applicable standard of heath care practice of the community and that there was a causal connection between the breaches of care and the death of Ms. Jones.

B&B did not provide the requisite proof to show that TVH or ACTV should have been included on a special verdict form. At no point did B&B produce any direct expert testimony as required by I.C. § 6-1012. During trial, the district court addressed this issue directly:

> [I]n order for that hospital to go on the verdict form, there has to be some support for the contention that they violated the standard of care applicable to hospitals. For example, if there was an expert on the standard of care for hospitals who would come in and say, it is a violation of the standard of care for hospitals in Boise in August 2004 to fail to have this type of line available for these reinfusion bags or to have this kind of cuff available

9

where it shouldn't be, where somebody might accidentally put it on a bag, then your point would be made and I'd put them on the verdict form. But there's no such testimony that's been adduced thus far and you're telling me there's no such expert whose going to testify to that fact. . . . Therefore, they're not going to be able to go on the verdict form.

The district court did not abuse its discretion in refusing to put TVH or ACTV on the special verdict form when it expressly informed B&B of what was required to support a claim of medical malpractice and B&B failed to present the evidence.

### 2. Haemonetics was properly excluded from the special verdict form.

B&B argues that (1) Haemonetics manufactured and marketed the cell saver machine and the reinfusion bag, (2) the machine was capable of injecting air, and did inject air, into the reinfusion bag, (3) the bag itself could be pressurized, and (4) Ms. Jones died of a fatal air embolism as a result. B&B contends that based upon this evidence and testimony of witnesses, the jury could have reasonably found that Haemonetics should have been included on the special verdict form. We disagree, finding that B&B did not properly raise this issue before the trial court and preserve it for appeal.

Idaho Rule of Civil Procedure 51(b) states that "[n]o party may assign as error the giving of or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, *stating distinctly the instruction to which that party objects and the grounds of the objection*." (Emphasis added). This Court has interpreted Rule 51(b) to require a specific objection, instead of just a blanket objection, to an instruction. *Vanderford Co., Inc. v. Knudson*, 144 Idaho 547, 556, 165 P.3d 261, 270 (2007); *see also Bates v. Seldin*, 2009 WL 530778 (Idaho 2009). In addition, Rule 51(b) contains similar language to I.C.R. 30(b), which this Court has interpreted as requiring a *specific* objection to a jury instruction. *State v. Anderson*, 144 Idaho 743, 749, 170 P.3d 886, 892 (2007).

Furthermore, I.R.C.P. 49(a) requires that a party object specifically to any omissions in instructions:

> The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury.

In *Lasselle v. Special Prods. Co.*, 106 Idaho 170, 173, 677 P.2d 483, 486 (1983), this Court interpreted Rule 49(a) to not "require more than is normally expected of a party when objecting to an adverse ruling." However, Rule 51(b) was amended in 2004 to include the requirement

10

that the party *distinctly* state the objection to a jury instruction. Therefore, we find that the language in Rule 51(b) is controlling, and B&B may not assign as error the failure to include Haemonetics on the special verdict form when it did not distinctly object to the exclusion of Haemonetics from the form.

B&B first raised the issue of including Haemonetics on the special verdict form when it proposed a special verdict form including Haemonetics with the pre-trial submission of its proposed set of jury instructions. Subsequently, during the jury instruction conference, the district judge stated:

> I realize that there will probably just be substantial argument on a few of these instructions, and—but I want to go over every one and make sure that the parties have a full opportunity to voice any objections or to suggest any jury instructions that have not been included in this packet.

Despite being provided with the opportunity to object to the exclusion of Haemonetics from the special verdict form, B&B said nothing. Instead, counsel simply made a blanket objection, stating "I'll make the same objection for the record concerning failure to give any instruction submitted by B&B and giving any instruction of any other party." Counsel then went on to address the instructions regarding proximate cause. Therefore, the court was not made aware of B&B's specific objection to the exclusion of Haemonetics from the special verdict form.

No further request was made concerning the special verdict form until B&B's motion for judgment notwithstanding the verdict, in which B&B argued that Haemonetics should have been included on the special verdict form because "Haemonetics manufactured the Cell Saver 3 Plus machine and designed and manufactured all of the disposable equipment used each time salvaged blood is processed." B&B asserted that permitting the jury to access Haemonetic's liability would have allowed B&B to "demonstrate to the jury the limited role and responsibility B&B had in the course of its successful and uneventful operation of the cell salvage machine."

However, at the subsequent hearing on B&B's motion for judgment notwithstanding the verdict, B&B argued that Haemonetics should have been included because "if the plaintiffs can go in, and without calling Haemonetics witnesses, can use an expert to go over and borrow Haemonetics material and come in and interpret it and put in question the Haemonetics training program, then I would logically argue that Haemonetics should [have been] on the verdict form . . . ." B&B appears to have been arguing in the hearing that Haemonetics should have been

11

included because the training program was at issue. This was not consistent with its argument in its original motion for judgment notwithstanding the verdict.

Finally, on appeal, B&B now argues that Haemonetics should have been included on the special verdict form because the machine did not contain a design mechanism to prevent air from collecting in the reinfusion bag *and* the warning on the reinfusion bag was not adequate. Even if B&B did properly preserve this issue for appeal, the only issue that was presented to the district court was the design of the machine, and the court found that B&B did not "present any evidence that Haemonetics was negligent for the construction of the blood-saver machine used in the surgery." In its appeal, B&B focuses on showing that it presented sufficient evidence of the inadequate warning on the reinfusion bag. Because we find that B&B did not properly preserve this issue for appeal, we affirm the district court's decision to exclude Haemonetics from the special verdict form.[3]

## D. Subsequent remedial measures.

B&B finally argues that the district court erred in refusing to admit Exhibit 311, which was TVH's revised protocol regarding the duties of autotransfusionists in the operating room. The revision included an additional paragraph which states: "The autotransfusion tech will remain in the OR room during cell saver use." B&B contends the exhibit was significant to its defense because it showed that, at the time of Ms. Jones's surgery, Kurtz had no duty to be in the operating room, except as necessary to operate or maintain the cell saver machine. The district court found the evidence to be inadmissible under I.R.E. 407. The court initially ruled that allowing Exhibit 311 would "run afoul of the prohibition about allowing subsequent remedial measure evidence to be introduced to the jury" because "[t]he policy behind the rule is to avoid the possibility of having a chilling effect on an institution or party engaging in remedial measures after the fact." The district court later stated in its Memorandum Decision and Order:

> The refusal to admit exhibit 311, a hospital protocol amended after the death of Lori Jones, was based on a ruling that the change in the protocol was a subsequent remedial measure. The change in policy of TVH as reflected in the changed protocol is aimed at preventing another death based on the actions of persons in the operating rooms. The Court did not err in finding this to be a subsequent remedial measure, therefore properly barred admission under I.R.E. 407.

---

[3] In addition, B&B's other proposed instructions did not address the issue of failure to warn or provide a legal basis upon which a jury could have found legal liability on the part of Haemonetics.

Idaho Rule of Evidence 407, which mirrors Federal Rule of Evidence 407, provides in pertinent part:

> When, after an injury or harm allegedly caused by an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct . . . . This rule does not require the exclusion of evidence of subsequent measures if offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

However, B&B argues, and the federal circuit courts have repeatedly held, that F.R.E. 407 does not prohibit the admission of subsequent remedial measures taken by a third party.

The question of whether or not to admit or exclude evidence is a matter of the trial court's discretion, and will not be overturned absent clear abuse of that discretion. *Morris v. Thomson*, 130 Idaho 138, 144, 937 P.2d 1212, 1218 (1997). A new trial is merited only if an error in excluding evidence affects a substantial right of one of the parties. *Id.* In *Pau v. Yosemite Park & Curry Co.*, 928 F.2d 880 (9th Cir. 1991), the Ninth Circuit held "a nondefendant will not be inhibited from taking remedial measures if such actions are allowed into evidence against a defendant." *Id.* at 888. The court found that the district court had abused its discretion in excluding from evidence a warning sign posted by a nonparty. *Id.* Here, unlike in *Pau*, we find that the district court did not abuse its discretion in excluding Exhibit 311 from evidence.

B&B claims that the exhibit was necessary to establish that Kurtz had no duty to be in the operating room at times pertinent to this case. However, the only additional direction provided by the revised protocol is that the autotransfusion technician remain in the operating room "during cell saver use." Instead, the issue was, when Kurtz *was* there in the room, did she do everything required of her to meet the standard of care. Furthermore, as Respondents argue, B&B produced ample evidence to make the point that Kurtz normally would not have been in the room once the machine was turned off, and had only remained in the room due to the fact that she could not wheel the machine out of the room until the reinfusion process finished. Therefore, Exhibit 311 was not needed to make the point that Kurtz was not required to be in the room and the exclusion of the evidence did not affect a substantial right of B&B. The exhibit demonstrated nothing about Kurtz's duty while she was actually present in the room. Thus, we affirm the district court's exclusion of Exhibit 311.

13

## III.  CONCLUSION

We affirm the district court's holdings on all issues raised by B&B in this appeal.

Justices J. JONES, W. JONES, HORTON and  KIDWELL, PRO TEM, **CONCUR.**